EVELYN CULLINANE *vs.* BOARD OF SELECTMEN OF MAYNARD.

No. 99-P-53.

Middlesex. November 6, 2000. - February 9, 2001.

Present: JACOBS, KAPLAN, & GILLERMAN, JJ.

*Dog. Nuisance.*

This court concluded that changes in circumstances over a five-year period, while an order of a board of selectmen to dispose of a dog pursuant to G. L. c. 140, § 157, was under appellate review, warranted remand of the matter for further proceedings. [854-855]

PETITION filed in the Concord Division of the District Court Department on February 6, 1997.

The case was heard by *Barbara S. Pearson*, J.

CIVIL ACTION commenced in the Superior Court Department on September 5, 1997.

The case was heard by *Stephen E. Neel*, J., on motions for summary judgment.

*Steven M. Wise* for the plaintiff.

*John H. Perten* for the defendant.

KAPLAN, J. This proceeding started with a complaint to the Maynard board of selectmen suggesting, in effect, that two dogs, "Shadow," a female Rottweiler, and her daughter "Misty," a mixed breed, were a pair constituting (to quote from G. L. c. 140, § 157[1]) "a nuisance by reason of vicious disposi-

---

[1]General Laws c. 140, § 157, as amended by St. 1995, c. 286, provides in part:

"If any person shall make complaint in writing to the selectmen of a town, the officer in charge of the animal commission or person charged with the responsibility of handling dog complaints of a city, or the county commissioners, that any dog owned or harbored within his or their jurisdiction is a nuisance by reason of vicious disposition or excessive barking or other disturbance, or that any such dog by such barking or other disturbance is a source of annoyance to any sick person residing in the vicinity such select-

tion," and seeking remedy by an "order concerning the restraint or disposal" of the dogs. The proceeding has wound its way from selectmen to clerk-magistrate to judge of District Court to Superior Court with regrettable slowness; it is now in its fifth year with the dogs left meanwhile in custody of the town's dog officer. The judgment of the Superior Court under review ordered the humane killing of both dogs. Pending the appeal, some six weeks before oral argument, Shadow died of cancer. That the subject now is Misty alone requires particular consideration, as we shall indicate.

1. The dog officer filed a complaint with the selectmen shortly after January 10, 1997. The selectmen held a public hearing on January 27, 1997, and heard witnesses, but no transcript or findings are before us; we have only the selectmen's order that the dogs be killed ("disposal" rather than "restraint" in the statute's terms). Pursuant to the statute, the owner, Evelyn Cullinane, took the case to a clerk-magistrate of the District Court who — again without transcript or findings before us — affirmed the selectmen's order, holding implicitly, we suppose, that the order was *not* "without proper cause or in bad faith." As the case passed to the District Court judge for "a de novo hearing," there was some thought of returning it to the selectmen, as Cullinane had lately made additional improvements on the grounds of her home to prevent any mischief by the dogs, and had sought further advice, now from an expert veterinarian. The parties abandoned the thought of remand as it was understood they could bring the situation up to date before the judge de novo. The judge received evidence on both sides which

men, officer in charge of the animal commission or person charged with the responsibility of handling dog complaints or county commissioners shall investigate or cause to be investigated such complaint, including an examination on oath of the complainant, and may make such order concerning the restraint or disposal of such dog as may be deemed necessary. Within ten days after such order the owner or keeper of such dog may bring a petition in the district court within the judicial district of which the dog is owned or kept, addressed to the justice of the court, praying that the order may be reviewed by the court, or magistrate thereof, and after such notice to the officer or officers involved as the magistrate deem necessary the magistrate shall review such action, hear the witnesses and affirm such order unless it shall appear that it was made without proper cause or in bad faith, in which case such order shall be reversed. Any party shall have the right to request a de novo hearing on the petition before a justice of the court. The decision of the court shall be final and conclusive upon the parties."

was recorded (although transcribed with many "inaudibles")[2]; she made findings and ruled for disposal of the dogs. Upon Cullinane's petition for certiorari to the Superior Court, the parties cross-moved for summary judgment on the record made at the de novo hearing, and the judge upheld the ruling below. Cullinane appeals.

2. The evidence went as follows. Cullinane, for eighteen years a teacher in the Andover public schools, bought the dogs from the Buddy Dog Humane Society in December, 1995. Shadow was then two years old. Cullinane kept the pair at her residence in Maynard. At the time, Cullinane had a four foot fence around her yard, and allowed the dogs in the yard when she was at home; otherwise she kept them in the house. Rottweilers are poor jumpers, but using snow banks accumulated during winter, 1996, the dogs were able to mount over the fence, and in March, 1996, they escaped and killed a rabbit at Catherine Loeb's place nearby.[3] Cullinane then for protection chained the dogs in the yard. In April, 1996, she installed a surrounding fence seven and one-half feet high and unchained the dogs.

In July, 1996, Cullinane entered the dogs in a two-week training program at a K-9 academy and for four months thereafter brought them back weekends for further training.

The dogs in October, 1996, began to outwit the fence by burrowing under it, to which Cullinane responded by trying to obstruct the passages. Nevertheless, the pair escaped on November 30, 1996, and one (or both) tore the ear off a pet goat at the local Bennett farm. Cullinane resumed chaining the dogs but on January 10, 1997, this failed[4] and the dogs turned up at Theresa Trioli's place. Shadow seized Trioli's cat; Trioli managed to retrieve the cat; in the process Shadow (seemingly in trying to get at the cat) snapped at Trioli and clawed at her. The dogs ran on to Bennett's place where Shadow killed a goat and the dogs together damaged a sheep.

---

[2]Called by Cullinane, besides herself: Robert Wiltse (her companion) and Dr. Amy Marder (veterinarian). By the selectmen: Theresa Trioli (first January 10 incident), Richard Monson (November 30 and second January 10 incidents), and Anne Desmarais (member, board of selectmen).

[3]Loeb asked the dog officer to speak to Cullinane about restraining the dogs.

[4]It seems Cullinane and her friend Robert Wiltse could have been somewhat more assiduous in trying to locate the dogs after they learned around 6:30 A.M. about the escape.

After the January 10 incidents (followed by the selectmen's hearing on January 27) Cullinane bought a twelve by twelve foot heavy chain link kennel which is held fast to the concrete base of an unused tennis court in the yard. She closed off any chance of burrowing under the fence. She said the dogs, if returned to her, would be allowed in the yard out of the kennel only when she was present with them.

In April, 1997, Dr. Amy Marder, an experienced veterinarian with expertness in animal behavior, retained by Cullinane, had an evaluation session with the dogs at the dog officer's kennels. Upon the experiences recounted to her and her own observations she concluded the pair had a predatory aggression (incurable in her opinion) toward other animals, but did not have an aggression or a vicious disposition toward humans; she would not exclude a possible threat of injury to a running child but thought such an event quite unlikely. She believed management procedures could be adopted that would avoid trouble even in respect to animals. She was satisfied with the sealing qualities of the tennis court kennel (called by others "fail safe" and a "fortress") and with the materials at and below ground level of the fence. (Further remarks about the evidence are reserved to point 3 below.)

3. The findings of record and the order of disposal were directed to the dogs as a pair or team. For present purposes we need say no more than that a ruling that the pair had a vicious disposition, at least in regard to animals, was a plausible result. The order for disposal of the pair, however, was subject to the possible criticism that it was reached without sufficient consideration of the several forms of the alternative of "restraint"[5] — especially when we may surmise that Cullinane was a conscientious owner and would no doubt have been willing to accept any reasonable directions about how she should manage and control the pair for the future.[6]

However all this might be, we now face the intractable fact

---

[5] The District Court judge thought the experience related by Trioli indicated disposal rather than "any milder method of dealing with the nuisance."

[6] In her brief — written before the death of Shadow — Cullinane sought to attack the validity of the judgment appealed from on a number of legal grounds that in the current situation need not be fully explored. She discussed the right to trial by jury in the District Court — but see *Commonwealth* v. *Ferreri*, 30 Mass. App. Ct. 966, 967 (1991); *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198, 199-200 (1982). (Cullinane made no timely demand for a jury.) So also she discussed the scope of review by the Superior Court on the

that there is no team — by Shadow's death only Misty remains. We can have no firm opinion about Misty's character or probable behavior as an orphan, for the triers did not confront those questions, they were adjudging the pair or team as such.

Nevertheless, the record does tell us something about Misty as an individual. It is reasonably clear that Shadow, the elder, was the dominant member of the team, and Misty the follower. Cullinane and Wiltse, both close to the dogs over a period of time and without motive for bias on the particular question, affirm this relationship of dominance and dependency between the dogs. Cullinane indeed speaks of Misty as "sweet" and "docile." We have also the testimony of Trioli with regard to the incident of the cat, and of the caretaker Richard Monson regarding the second incident at Bennett's, that Shadow was the tougher of the two in action, with Misty readier to back off and quit the game and return to a handler.

Imponderable because unknown to us is the present physical and psychological condition of Misty after a reprieve of so many years in the kennels of the town's dog officer.

In all the circumstances justice would be affronted by the prospect of carrying out now the order to dispose of Misty, and justice requires that her case be remanded for further consideration with leave to the parties to introduce additional evidence appropriate to the purpose. We are in hopes that Misty's fate may be decided, if not by prompt agreement, then by a brief proceeding.

The judgment of the Superior Court is vacated. A new judgment shall enter remanding the case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

petition for certiorari, as to which the discussion in *Nercessian* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 46 Mass. App. Ct. 766, 772-773 (1999), would be found interesting.